**B.P.G. AUTOLAND JEEP–EAGLE, INC. d/b/a B.P.G. Autoland, et al., Plaintiffs,**

v.

**CHRYSLER CREDIT CORPORATION, Defendant.**

**Civ. A. No. 91–12265.**

United States District Court, D. Massachusetts.

March 27, 1992.

---

Eugene D. Isaak, Lawson & Weitzen, Boston, Mass., for plaintiffs.

Richard Allan Savrann, Allan R. Curhan, Curhan, Kunian, Goshko, Burwick & Savrann, P.C., Boston, Mass., Richard M. Gilbert, Robert D. Cultice, Goldstein & Manello, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

DAVID S. NELSON, District Judge.

### I. *Introduction*

This case is brought by plaintiff auto dealership and its principals and guarantors against defendant credit corporation, plaintiff's inventory financer, for breach of contract to make a capital loan (Count I), breach of fiduciary duty and covenant of good faith and fair dealing (Count II), violation of Mass.Gen.Laws ch. 93A, § 11 (Count III), violation of Connecticut General Statutes 42–133e–h (Count V), and violation of Connecticut General Statutes 42–133r–ee (Count VI). See Complaint, Docket No. 3, Exhibit 1. Defendant has filed counterclaims against B.P.G. Autoland Jeep–Eagle, Inc. (hereinafter, "B.P.G.") alleging violations of its security agreement and promissory note and against Lawrence and Arlene Bellerose and Brian and Ulrika Gates based on their guaranties of B.P.G.'s obligations and liabilities.

Specifically, this court here considers defendant's several motions regarding a preliminary injunction issued in favor of plaintiffs on November 26, 1991, 785 F.Supp. 222 (1991). Defendant's motions are entitled, *Defendant Chrysler Credit Corporation's Motion to Vacate Order and/or for Finding of Contempt*, Docket No. 41; *Defendant's Motion for Clarification*, Docket No. 42; *Defendant Chrysler Credit Corporation's Motion to Modify or Vacate Order and/or for Finding of Contempt*, Docket No. 64; *Chrysler Credit's Emergency Motion for an Evidentiary Hearing and for Judicial Guidance*, Docket No. 75. On February 28, 1992, this court declared that it would consider these motions as timely motions to reconsider the

preliminary injunction. For the reasons set forth below, this court now vacates its Order for preliminary injunction.

## II. *Procedural History*

This case was originally filed in Bristol Superior Court in the Commonwealth of Massachusetts in August of 1991. That court issued a temporary restraining order prohibiting CCC from foreclosing on B.P.G.'s financing agreement with CCC. Defendant then removed this case to federal court pursuant to 28 U.S.C.A. § 1446 (West 1973 & Supp.1991). This court allowed plaintiff's motion for a temporary restraining order on September 17, 1991, which ordered CCC to restore B.P.G.'s floorplan financing privileges and remit all monies of B.P.G. in CCC's possession. On September 23, 1991, this court modified the temporary restraining order vacating that portion requiring remission of monies to B.P.G.

On November 26, 1991, this court issued a preliminary injunction ordering CCC to reinstate B.P.G.'s floorplan financing agreement and to forward all factory credits earned by B.P.G., and ordering B.P.G. not to exceed its out-of-trust debt as of that date, to pay interest on all indebtedness, including the SOT amount, and to collateralize its indebtedness to CCC in full. As stated above, CCC then filed a series of motions, which this court now considers as a motion to reconsider the preliminary injunction.

## III. *Factual Background*

Plaintiffs Lawrence Bellerose (hereinafter, "Bellerose"), Brian P. Gates (hereinafter, "Gates"), and Robert DeRita (not a party to this suit) (hereinafter, "DeRita") are shareholders of the B.P.G. automobile dealership, located at 135 Providence Pike, Putnam, Connecticut. They hold 37.5%, 37.5%, and 25% of the shares in B.P.G., respectively. Arlene Bellerose is the wife of Lawrence Bellerose, and Ulrika Gates is the wife of Brian Gates. All individual plaintiffs reside in Putnam, Connecticut. In addition, Bellerose and Gates are sole shareholders in Providence Pike Realty Corporation (hereinafter, "PPRC"), which is the owner and lessor of the building and real property serving as the place of business for its tenant, B.P.G.

Chrysler Credit Corporation (hereinafter, "Chrysler Credit" or "CCC") is affiliated with Chrysler Motors Corporation (hereinafter, "CMC"), is incorporated under the laws of the State of Delaware, and has a usual place of business in Southfield, Michigan. CCC provides automobile loans to consumers and credit and financial services to automobile dealers. CCC has an office in Seekonk, Massachusetts, with which plaintiffs in this action have primarily dealt.

On September 29, 1989, B.P.G. Autoland Jeep–Eagle Dealership consummated its existence as a Chrysler franchise with the following series of documents. B.P.G. undertook two American Motors Sales Corporation Sales and Service Agreements (hereinafter, "Sales and Service Agreements") with American Motors Sales Corporation, identical except that one refers to Jeep products and service and the other to Eagle (Complaint, Docket No. 1, Exhibit 1). Also signed on September 29, 1989 was a "Minimum Working Capital Agreement DAP–10J" between B.P.G. and Jeep Eagle Sales Corporation (hereinafter, "JESC"), which set a figure of $162,948 as necessary at a minimum to "carry out said Dealer's undertakings."

In order to obtain inventory financing for the dealership, B.P.G. executed a number of documents in favor of Chrysler Credit. On October 5, 1989, B.P.G. and CCC signed a Security Agreement and Master Credit Agreement and an Amendment to the Security Agreement and Master Credit Agreement (hereinafter, collectively referred to as "Security Agreement" or "Agreement"), which essentially provided B.P.G. with a revolving line of credit to purchase vehicles from the manufacturer. By the terms of this agreement, CCC was to provide B.P.G. wholesale financing for "new and unused vehicles sold and distributed by American Motors Sales Corp." This financing was to be provided by CCC in the form of loans or advances to B.P.G. in return for a security

interest in the vehicles financed per the Agreement and all other assets of B.P.G.'s business. B.P.G. in return agreed to "promptly remit to Secured Party [CCC] the total amount then outstanding of Secured Party's Advance on each such Vehicle." Security Agreement, ¶ 2.1. This financing arrangement between B.P.G. and CCC is known in the parlance of the business as a "floorplan financing agreement" or "floorplan."

The Security Agreement then lists situations constituting "Events of Default," which allow CCC to "take immediate possession of said Vehicles without demand or further notice and without legal process."

Further, particularly pertinent to the motions at hand are the following provisions of the Security Agreement:

*General* ...

This Agreement cannot be modified or amended, except in writing by both parties unless otherwise specifically authorized herein, and shall be binding and inure to the benefit of each of the parties hereto and their respective legal representatives, successors and assigns.

.    .    .    .    .

No failure or delay on the part of Secured Party in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power preclude any other or further exercise thereof or the exercise of any other right or power hereunder. The remedies herein are in addition to those available in law or equity, and Secured Party need not pursue any rights it might have as a Secured Party before pursuing payment and performance by Debtor or any guarantor or surety.

Docket No. 1, Exhibit 2.

In addition to the Security Agreement, on October 5, 1989, Gates executed a promissory note on behalf of B.P.G. and in favor of CCC for a total of $1.5 million dollars; an Assignment of Factory Credits by which B.P.G. authorized CCC to receive monies due to B.P.G. from CMC; a Dealer Cash Management Agreement; Power of Attorney and Signatory Authorization; and,

Dealer Payment Authorization, by which B.P.G. authorized CMC to accept payment from CCC for B.P.G.'s orders. Finally, Arlene and Lawrence Bellerose and Ulrika and Brian Gates executed personal guaranties for B.P.G.'s debt to CCC on documents entitled "Continuing Guaranty."

On April 27, 1990, B.P.G. and CCC entered into a separate security agreement by which CCC financed $31,814.18 worth of equipment for B.P.G. *See* "Security Agreement Dealer Equipment."

As to its financial difficulties, by January of 1990, B.P.G. was unable to repay CCC the amount it had financed as vehicles were sold, which constituted a violation of the Security Agreement. Because the dealership holds the amount advanced by CCC (usually the wholesale cost of the automobile) in trust after the sale of a vehicle, failure of the dealer to remit this amount to CCC promptly results in the dealer being "out of trust" and the vehicles are said to be "sold out of trust" (hereinafter, "SOT" or "out of trust"). This out-of-trust condition was an event of default under the Security Agreement.

After the onset of B.P.G.'s out-of-trust condition, the series of events between the parties is a matter of great contention. The plaintiffs' rendition of the facts, according to their complaint, claims that Brian Gates informed Manuel Silva, an employee of CCC, about B.P.G.'s SOT condition in January of 1990, when the first vehicle was sold out of trust. Complaint at ¶ 23, Docket No. 1. Plaintiffs maintain that CCC was continually cognizant of B.P.G.'s out-of-trust status. "At all times, CCC performed regular audits and was aware of the magnitude of the sales out of trust by B.P.G." Complaint at ¶ 25. B.P.G. admits that, during 1990, its total sales out of trust reached $300,000. *Id.* However, plaintiffs contend that throughout 1990 CCC indicated that it would provide additional capital financing for B.P.G. Complaint at ¶¶ 24, 26, 27, 28, 29, & 31. In fact, B.P.G. claims to have foregone an opportunity in May of 1990 to refinance its property with Citizen's National Bank of Putnam (hereinafter, "Citizen's National"

or "Bank"), which would have provided $250,000 in working capital. Complaint at ¶ 32. B.P.G. asserts that at CCC's bidding it turned down the bank financing in favor of a loan anticipated from CCC. ¶¶ 33, 34. Then, in January of 1991, CCC informed B.P.G. that it would not supply the loan, and B.P.G. was required to collateralize the out-of-trust amount. Complaint at ¶ 30. In November of 1990, CCC took possession of titles and certificates of origin on B.P.G.'s automobiles. Complaint at ¶ 39. CCC then required an infusion of $425,000 in working capital by August 23, 1991. Complaint at ¶ 45. When plaintiffs did not comply with CCC's mandate, B.P.G.'s privileges under the floorplan were suspended. Complaint at ¶ 51.

CCC paints a much different picture of these events. CCC claims that it did not discover the magnitude of B.P.G.'s out-of-trust status until July of 1990 when a bank cut-off revealed the depth of the debt. 9/23/92 *Silva Aff.* at ¶¶ 4, 6; 8/19/91 *Gates Aff.,* ¶ 23. This revelation is substantiated, asserts CCC, by the fact that B.P.G.'s accountant apparently misaccounted for the S.O.T. amount as an account payable, which made the condition difficult to detect. *Chrysler Credit's Supplemental Memorandum in Support of its Motion to Dissolve Preliminary Injunction,* January 24, 1992, 15 (hereinafter, *CCC's Memorandum of Jan. 24, 1992*) (citing 9/23/91 *Rencurrel Aff.* at ¶ 8).

CCC then recounts a series of events that demonstrate attempts by the parties to resolve B.P.G.'s default condition. CCC claims that B.P.G. indicated a bank loan from Citizen's National would provide enough cash to retire B.P.G.'s SOT by November 1, 1990. When Citizen's National was not forthcoming with the loan, plaintiff B.P.G. formulated several options for resolving its default, which included applying for a loan from CCC, which CCC ultimately denied. *CCC's Memorandum of Jan. 24, 1992,* 17–18 (and citations therein).

In early 1991, CCC became more resolute in demanding that B.P.G.'s principals provide additional working capital to retire the default debt and to keep B.P.G. operation-

al. *Id.* at 18. CCC issued several demand letters requiring an infusion of capital by a date certain. However, owing to various interim concessions of B.P.G., the deadlines for capitalization were constantly extended. *Id.* A final demand letter cited August 23, 1991 as the deadline for a $425,000 recapitalization. Failure to meet this deadline, stated the letter, would result in possible termination of the floorplan, recall of the outstanding indebtedness and repossession of collateral. *Id.* at 20. When B.P.G. attempted to order 1992 model automobiles without the requested recapitalization, CCC refused to finance the order, placing B.P.G. on "finance hold" until the SOT condition was resolved. *Id.* at 20–21.

For purposes of the motions before the court, I find the following. The financial documents, including the Security Agreement between B.P.G. and CCC, were properly negotiated at arms length. B.P.G. was out-of-trust since January, 1990. This condition continues, with fluctuations in amount reaching as much as $300,000, until the present. B.P.G. did attempt to remortgage its property (through PPRC) with Citizen's National Bank. However, it never received a firm commitment from that Bank for an additional mortgage.

IV. *Legal Analysis*

   A.  The Security Agreement.

As indicated above, a Security Agreement and Master Credit Agreement was negotiated between the parties and signed on October 5, 1989 by Brian P. Gates as President of B.P.G. Autoland Jeep/Eagle, Inc. and R.B. Rencurrel for Chrysler Credit Corporation. The execution was witnessed by R.G. Pineault. An Amendment to the Security Agreement was also executed and witnessed by the above parties on October 5, 1989.

   1. *Terms of Financing.* By the terms of the Security Agreement, the Debtor, B.P.G.,

agrees that *upon the sale of each Vehicle with respect to which an Advance has been made by Secured Party [CCC], Debtor will promptly remit to Secured Party the total amount then outstand-*

*ing of Secured Party's Advance on such Vehicle* unless other terms of repayment have been agreed to by Secured Party. *Debtor agrees to hold in trust for Secured Party and shall forthwith remit to Secured Party, to the extent of any unpaid and past due indebtedness hereunder, all proceeds of each Vehicle when received by Debtor,* or to allow Secured Party to make direct collection thereof and credit Debtor with all sums received by Secured Party.

Security Agreement at ¶ 2.1 (emphasis added). The Agreement further gives CCC sole discretion to make further Advances to B.P.G. "It is understood and agreed that the making of any Advance hereunder shall be at the option of Secured Party and shall not be obligatory, and the right of Debtor to request that Secured Party make Advances may be terminated at any time by Secured Party at its election without notice." Agreement at ¶ 1.0.

2. *Events of Default.* The Security Agreement declares that the following comprises an Event of Default.

Debtor shall fail to make any payment to Secured Party whether constituting the principal amount of any Advance, interest thereon or any other payment due hereunder, when and as due in accordance with the terms of this Agreement or with any demand permitted to be made by Secured Party under this Agreement ...

Agreement at ¶ 6.0(a). In the Event of Default, the Agreement allows that the "Secured Party may take immediate possession of said Vehicles without demand notice and without legal process."

3. *Modification and Non–Waiver Clauses.* Finally, under the *"General"* provisions of Security Agreement, two provisions crucial to this motion reside. First, "[t]his Agreement cannot be modified or amended, except in writing by both parties unless otherwise specifically authorized herein, and shall be binding and inure to the benefit of each of the parties hereto and their respective legal representatives, successors and assigns." Agreement at ¶ 8.3 Second, the agreement provides

No failure or delay on the part of Secured Party in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power preclude any other or further exercise thereof or the exercise of any other right or power hereunder. The remedies herein are in addition to those available in law or equity, and Secured Party need not pursue any rights it might have as a Secured Party before pursuing payment and performance by Debtor or any guarantor or surety.

Agreement at ¶ 8.6.

The consequence of these clauses to a claim of breach of implied covenant of good faith and fair dealing under Connecticut law is dire. "The nonwaiver clause at issue has the effect of assuring that certain conduct, such as forbearance, may not carry legal consequences which might ensue absent a prior agreement." *S.H.V.C., Inc. v. Roy,* 188 Conn. 503, 506, 450 A.2d 351 (1982) (commercial lessee whose late payments of rent had been accepted by lessor, could not argue that this forbearance invalidated lessor's right to terminate for late payment when the lease contained a nonwaiver clause). The Connecticut Court has further determined,

To find, as the defendant urges, a result directly contrary to the literal contract terms would make it virtually impossible for parties to plan or express their relationships. Since we view forbearance, as evidenced in this case, to be an act for the defendant's own benefit, we cannot predicate an estoppel in favor of one who is a wrongdoer in the sense that he has consistently violated the terms of the agreement. The defendant's reasoning would have us punish such an act and reward the wrongdoer. The defendant claims that he relied on the plaintiff's forbearance to his detriment. This is balanced by the plaintiff's justifiable reliance on the written contract which stated that forbearance would not result in the relinquishment of his rights. Accordingly, there is no reason in either law or

equity for invalidating the nonwaiver clause.

*Id.* 188 Conn. at 508, 450 A.2d 351.

The Connecticut courts have validated non-waiver clauses in a variety of contractual arrangements to overcome claims of waiver, estoppel, or breach of an implied covenant of good faith and fair dealing. *Tillquist v. Ford Motor Credit Co.,* 714 F.Supp. 607 (D.Conn.1989) (antiwaiver clause contained in retail installment contract allowed creditor to exercise its contractual right to repossession despite creditor's acceptance of late payments); *Gaynor v. Union Trust Co.,* 216 Conn. 458, 582 A.2d 190 (1990) (secured lender's repeated acceptance of late payments for used car loan did not preempt its contractual authority to repossess automobile where security agreement contained nonwaiver clauses); *Christensen v. Cutaia,* 211 Conn. 613, 560 A.2d 456 (1989) (lender's acceptance of late payments did not cure default and negate lender's right to acceleration where promissory notes contained a nonwaiver clause); *Connecticut Nat. Bank v. Brown,* No. CV 90 0107084S, 1991 WL 273702, 1991 Conn.Super. LEXIS 3014 (Conn.Superior Court December 10, 1991) (defendants successfully defend mortgage foreclosure despite acceptance of late payments).

Plaintiffs seize upon *Roy,* 188 Conn. 503, 450 A.2d 351, which is a seminal case validating the enforcement of nonwaiver clauses, to argue that "acts of bad faith and sharp business practices" may still invalidate a nonwaiver clause. *Plaintiffs' Response to Defendant's Motion for Leave to File Additional Papers* at 9–11, Docket No. 92. However, the history of the Court's interpretation of nonwaiver clauses has developed no such invalidation nor does this court find any behavior on CCC's part that would prompt invocation of an exception. In fact, in the line of cases since *Roy,* the Connecticut courts have not even see fit to mollify the effect of a nonwaiver clause when a consumer presents as creditor, *Gaynor v. Union Trust Co.,* 216 Conn.

458, 582 A.2d 190 (1990), despite that consumers are traditionally afforded a greater degree of protection when dealing with a business entity. *See Fuentes v. Shevin,* 407 U.S. 67, 94–95, 92 S.Ct. 1983, 2001, 32 L.Ed.2d 556 (1972).

As the facts have been placed before this court, plaintiffs admit to having an uncured Event of Default—B.P.G.'s substantial sales out-of-trust. The consequences of an out-of-trust condition are clearly provided in the Agreement. The Agreement gives CCC, as secured creditor, the option to repossess its collateral, to call in B.P.G.'s outstanding debt, and to refuse further financial advances. In addition, any modification to this arrangement, by the terms of the contract, must be reduced to writing. Plaintiffs have not come forth with any such modifications.

This court originally accepted plaintiffs' arguments that CCC's tolerance of B.P.G.'s out-of-trust condition and its continual relaxation of demands on B.P.G. constituted a waiver of CCC's contractual recourse, making CCC's subsequent abrupt refusal to continue the floorplan financing arrangement a breach of an implied covenant of good faith and fair dealing. However, despite defendant's failure to advance or develop the relevance and legal effect of the nonwaiver clause to this case in its response to plaintiffs' motion for preliminary injunction [1], the court cannot deny the substantial legal force of this clause. The Connecticut courts have repeatedly and definitively validated nonwaiver clauses; this court is compelled to do the same.

B. Effect of the Nonwaiver Clause on Preliminary Injunction.

■ Although the court considers four elements when deciding a motion for preliminary injunction, *Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981) (citing *Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542, 544 (D.Me.1979)), in this Circuit the

---

**1.** In *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order* (Docket No. 18), the only possible reference this court discerns to the nonwaiver clause is

that "[d]efendant relied on contracts signed by BPG and acted well within its rights thereunder," which appears on page 10.

linchpin of injunctive relief is likelihood of success on the merits. *Lancor v. Lebanon Hous. Auth.,* 760 F.2d 361, 362 (1st Cir. 1985); *Auburn News Co. v. Providence Journal Co.,* 659 F.2d 273, 277 (1st Cir. 1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

As discussed above, plaintiffs' so-called "lender liability" claims are fatally undercut by the nonwaiver clause contained in the Security Agreement, which dictates the financial relationship of the parties. "While inconsistent conduct may, under certain circumstances, be deemed a waiver of a right to acceleration, the insertion of a nonwaiver clause is designed to avoid exactly such an inference." *Christensen v. Cutaia,* 211 Conn. 613, 619–20, 560 A.2d 456 (1989). Reviewing plaintiffs' claims in light of the nonwaiver clause, the court can no longer maintain that plaintiffs are likely to succeed on the merits. Therefore, failing on this fundamental element of injunctive relief, plaintiffs' preliminary injunction must be vacated.

### C. Plaintiffs' Failure to do Equity.

■ The equitable powers of the court can only be justly invoked by deserving parties.

'[C]hancery has power to force a defendant to comply with the dictates of conscience as to matters outside the strict rules of law. Correspondingly, it will not interfere on behalf of a plaintiff whose own conduct in this connection has been contrary to conscience. In other words, since equity tries to enforce good faith in defendants, it no less stringently demands the same good faith from plaintiff.'

11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2946, 413 (1973 & Supp.1991) (quoting Chafee, Some Problems of Equity, 1950, 1).

■ 1. *Foregone Opportunity With Citizen's National Bank.* In their verified complaint, plaintiffs put forth the following to describe an "opportunity" to refinance PPRC's mortgage with Citizen's National Bank.

32. In May, 1990, Gates had an opportunity to refinance the PPRC property at the Bank for $750,000. This would have enabled Gates and Bellerose to further capitalize BPG and pay off the out of trust arrearage.

33. Gates was dissuaded from entering into this loan by Manuel Silva of CCC who stated that CCC could loan the same amount at a lower interest rate and on better terms.

34. *Gates turned down the Bank offer;* CCC refused to go through with the loan. The Bank will no longer entertain an application for refinancing from BPG at this time.

Complaint at 8 (emphasis added). Plaintiffs further state in their memorandum supporting their motion for preliminary injunction, *"Gates turned down an early offer to refinance the dealership* building with the existing first-mortgage lender because he was assured the CCC loan would be on better terms." *Brief in Support of Plaintiffs' Motions for Temporary Restraining Order and Preliminary Injunction,* (hereinafter, "Plaintiffs' Brief"), Docket No. 1, at 7 (emphasis added).

In direct contrast to these statements, the Deposition of Robert Silva, president of Citizen's National, indicates that Citizen's Bank never agreed to make a loan to B.P.G. and in fact turned B.P.G. down on April 24, 1990. *Chrysler Credit's Supplemental Memorandum in Support of Motion to Dissolve Preliminary Injunction,* Filed February 18, 1992, Exhibit A, pp. 92–98.

A second of plaintiffs' inaccuracies concerns a letter dated November 1, 1990 (hereinafter, "Nov. 1 Letter") from Andrew Lubin, an attorney for CCC, to Edwin Higgins, III, an attorney for B.P.G., which plaintiffs refer to as one of the "many documents which refer to the promises [for a capital loan from CCC] and on one occasion, CCC's attorney wrote a letter to Autoland's attorney requesting certain documents in connection with the proposed loan." However, when read in tandem with a second letter from Attorney Lubin to Attorney Higgins, dated November 19,

1990 (hereinafter, "Nov. 19 Letter"), the Nov. 1 Letter clearly cannot support plaintiffs' contention. The November 19 Letter states, "As I indicated in our telephone conversation, my letter of November 1, 1990 envisioned only a secondary mortgage on your client's property and that no money was to be advanced. *I have since found out that your clients have requested that Chrysler payoff the existing mortgages and advance some working capital.*" *Affidavit of Robert B. Rencurrel in Support of Chrysler Credit's 12/5/91 Motion,* Exhibit A, Docket No. 105 (emphasis added). Thus, even if at the time B.P.G. received the Nov. 1 Letter, B.P.G. understood the letter to refer to a capital loan, the Nov. 19 Letter certainly clarified that it did not—at a time well before the filing of this suit.

Plaintiffs correctly observe that neither of the above inaccuracies is directly relied upon by the court in its November 26 Order for preliminary injunction. However, in assessing the relative equities of these parties' actions, this court certainly relied on the good faith of plaintiffs' assertions. Whether the above inaccuracies were a result of sloppiness, irresponsible advocacy, or intended misrepresentations, the court cannot in good conscience extend the hand of equity to plaintiffs, when they were irresponsible, at best, in making their case.

2. *Increase in Plaintiffs' Sales Out of Trust.* When it comes to manipulating the numbers involved in this case, certainly both sides are *in pari delicto.* However, regardless of the accounting method or the date of accounting or whatever additional smoke and mirrors the parties place before this court, one disappointing fact appears irrefutable. From the time this court issued a temporary restraining order on September 17, 1991 until the preliminary injunction was ordered on November 26, 1991, B.P.G.'s sales out of trust increased substantially.

In their verified complaint, plaintiffs estimate the out-of-trust amount to be "approximately $200,000." Complaint at ¶ 36. In a memorandum filed by plaintiffs on September 26, 1991 in support of their motion for injunctive relief, plaintiffs assert

that, "[p]ermitting the SOT status to continue, *pendente lite,* under the same terms (collateralized, interest being paid, and SOT amount not to grow beyond $200,000.00) will merely maintain the *status quo.*" *Plaintiffs' Supplementary Memorandum in Support of Motion for Preliminary Injunction* at 2, Docket No. 17. Further, at a status conference before this court on November 25, 1991, counsel for B.P.G. indicated that its last reading of the SOT amount was $145,000. However, on the next day, when the Order for preliminary injunction was issued, plaintiffs contend that the SOT condition in reality amounted to $257,245.31. *Plaintiffs' Opposition to Motions for Clarification and to Vacate Order and/or for Finding of Contempt* at 7, Docket No. 49.

Again, although plaintiffs are not in violation of the wording of the November 26, Order, they have undermined the equitable spirit of the relief granted. This court relied on plaintiffs' representations that they endeavored solely to maintain the status quo of $200,000 and that, in fact, the SOT amount had been reduced in the interim between the temporary restraining order and preliminary injunction.

## V. *Conclusion*

As the November 26 preliminary injunction is an interlocutory order of this court, the court retains power to modify or vacate. "[S]o long as the court has jurisdiction over an action, it should have complete power over interlocutory orders made therein and should be able to revise them when it is 'consonant with equity' to do so." 7 James W. Moore et al., Moore's Federal Practice, ¶ 60.15[4], pp. 60–124—60–125 (2d ed. 1992); *John Simmons Co. v. Grier Bros. Co.,* 258 U.S. 82, 90, 42 S.Ct. 196, 199, 66 L.Ed. 475 (1922) ("if an interlocutory decree be involved, a rehearing may be sought at any time before final decree, provided due diligence be employed and a revision be otherwise consonant with equity").

This court finds that it is neither "consonant with equity" nor in conformity with the law that the preliminary injunction is-

sued on November 26, 1991, remain in effect. This court hereby vacates the preliminary injunction. The court will further endeavor to resolve the issues before it as expeditiously as possible and, as necessary, set a date for trial.

SO ORDERED.