Toomey, J.
BACKGROUND
Plaintiff has sought declaratory judgment to resolve a dispute concerning defendants’ demand that plaintiff pay certain charges arising out of defendants’ providing utility service to plaintiff and maintenance to private ways used by plaintiff. The matterwas tried, jury-waived, and evidence, both testimonial and documentary, was received at the trial. For the reasons stated, infra, judgment shall enter declaring the rights and duties of the parties in the manner hereinafter specified.
THE POSITIONS OF THE PARTIES
By his complaint, the plaintiff, Herbert R. Rasnick, seeks a declaration in three parts. First, plaintiff claims that the controlling deeds oblige defendant Herring to maintain and repair the utilities within certain private ways, to permit plaintiff to use said utilities and to pay for the utility services that plaintiff uses. Count I. Second, plaintiff asserts that the election of officers of the “Proprietors of Brussels Street and Appian Way” (hereinafter, the “Proprietors”) was in violation of G.L.c. 84, §12 and that, because said *162 officers were not duly elected, their levying of certain monetary assessments upon plaintiff is illegitimate. Count II. Third, plaintiff contends that, assuming arguendo the efficacy of the election, the actions of the officers in levying the assessments were ultra vires the “Proprietors” for the reason that the foundation statute, G.L.c. 84, §12, permits neither retroactive assessments nor utility service assessments. Count III.
Defendants have responded that plaintiff, not defendants, ought, by reason of the deeds, to bear the cost of the services provided through the utiliiy pipes, lines and mains, that the officers of the “Proprietors” were elected in accordance with law and that the officers’ assessments upon plaintiff were well within the authority granted to the “Proprietors” by G.L.c. 84, §12.
The dispute at bar, therefore, centers upon the validity of the assessments heretofore made by defendants and the exposure of plaintiff to future assessments.
FINDINGS OF FACT
Based upon the evidence adduced at trial, I make the following findings of fact:
1. Plaintiff holds his property (consisting of two parcels in the Whittal complex) as a result of a transfer by deed from Whittal Associates, Inc., initially to plaintiffs predecessor in title and eventually to plaintiff.
2. Defendants hold their properties (consisting of different parcels in the Whittal complex) as a result of a transfer by deed from Whittal Associates, Inc., initially to the defendants’ predecessors in title and eventually to defendants.
3. Each deed material to this controversy contained, either expressly or by reference, a covenant containing the following provisions:
The grantee covenants to maintain at its own expense all of said utility lines, sewers and mains which are within the granted premises and serve any part of the grantor’s remaining land, and the grantor covenants to maintain at its own expense all of said utility lines, sewers and mains which are within any part of its remaining land and serve the granted premises, and the parties further covenant with each other that in the event of failure so to maintain, the owner of the premises served by said utility lines, sewers and mains may enter the premises through which they run in order to maintain them and shall be reimbursed for the expense of such maintenance ... All of the foregoing obligations contained in this paragraph and the corresponding rights shall bind and benefit all successors in title to the premises in which said utility lines, sewers and mains or replacements or relocations thereof are located, but the grantor and the grantee and each of their successors in title shall be liable only for any breach committed while owner of premises affected thereby.
4. Each such deed also carried a covenant pertaining to the grantor’s successors’ obligation to provide steam to the grantees and their successors and detailing the terms for the latters’ payment for said steam. That covenant is as follows:
The grantor covenants to supply to the grantee and its successors in tide, through the steam pipes now existing or replacements thereof or such additional steam pipes as may be installed by the grantee or its successors in title in a location approved by the grantor or its successors in title, such steam as the grantee and its said successors in title shall require for heating the present buildings on the granted premises and for process steam used for manufacturing purposes thereon, such supply to be at the same rates as shall from time to time be charged in Boston, Massachusetts by the Boston Edison Company or any successor public utility company for the same amount of steam. Payment for such supply of steam shall be made for each calendar month within ten days of receipt of bill for that month. The foregoing covenant shall be binding upon the existing building of the grantor known as No. 12 Boiler House and that part of the grantor’s remaining land which lies under it and on no other part of it. In no event shall the grantor or any of its successors in title be under any liability for any failure to supply steam for causes beyond the control of the grantor or that of any such successor in title (including, without limitation, among such causes breakdowns and inability to obtain fuel or labor) and the grantor and any such successor in title shall be liable only for any breach committed while owner of said Boiler House. All obligations to furnish steam may be terminated by the grantor, the grantee, or any successor in title of either of them by written notice given to the other party, such written notice if given by the grantor or the grantor’s successors in title to be at least one year prior to the termination, and if given by the grantee or the grantee’s successors in title to be at least six months prior to such termination. The grantor and its successors in title shall have a lien upon the above-described premises, but not the parcel hereinafter described, for all amounts due and payable on account of steam supplied hereunder and may without liability discontinue the supply of steam in event any amounts due and payable are not paid, provided that ten days’ written notice of such discontinuance is first given and payment of all such amounts has not been made at the expiration of ten days after the giving of notice.
5. Brussels Street and Apian Way are private ways within the boundaries of the Whittal complex.
6. Defendant Herring is the record owner of Brussels Street and Appian Way.
7. Plaintiff possesses, by deed, a right of way in Brussels Street and Appian Way.
8. On February 5, 1986, defendant Herring delivered an invoice to plaintiff seeking payment of $2,885.60 for “repair [of a] broken water pipe and replacement of a] *163 fire hydrant and valves on your property on Brussels Street.” The invoice (less a small amount in set-off) was paid by plaintiff on April 30, 1986.
9. There are at least four abutters to Brussels Street and Appian Way, including the owner (defendant Herring) of said ways.
10. On May 16, 1988, four abutters petitioned the Clerk of the Worcester District Court pursuant to G.L.c. 84, §12 for a “proprietors’ meeting” for the purpose, inter alia, of choosing an assessor to determine an equitable allocation of costs in connection with the “maintenance and repair” of Brussels Street and Appian Way; plaintiff was not one of the petitioners, although he is an abutter.
11. The Clerk responded with a warrant authorizing the posting of notice of said meeting for the purpose of addressing the “maintenance and repair” of Brussels Street and Appian Way; the notice was to recite that the meeting would be held in the Clerk’s office at 2:30 p.m. on September 8, 1988.
12. On or before June 12, 1988, the warrant containing the notice was posted by a constable “at the main front and rear entrances of the Worcester County Court House”; notice of the meeting was also served, by mail, upon the proprietors, but no such notice by mail was provided to plaintiff.
13. On September 8, 1988, the proprietors’ meeting commenced and, according to its minutes, was limited to an election of defendants Blanche Lonstein as Clerk, Arthur Herring as Surveyor and Norman Wilhemy as Assessor.
14. On or before August 3,1989, the constable posted, at the front and rear entrances of the Worcester County Court House, another warrant, also issued by the Clerk of the Worcester District Court, giving notice of a meeting of the proprietors in the Clerk’s office at 2:00 p.m. on August 15, 1989. A copy of the warrant was also mailed to the proprietors, including plaintiff.
15. On August 15, 1989, the proprietors’ meeting commenced and, according to its minutes, was limited to a vote modifying the manner of giving notice of future proprietors’ meetings and a vote dealing with the locus of future meetings.
16. More than three years later, a number of invoices were submitted by defendant Herring to plaintiff seeking his payment for various charges that the proprietors had levied against him. Those invoices consisted of the following:
a. October 21, 1992 — $22,867.96
(for “street and water expenses [including plowing, sanding, sewer, ADT, etc.] 1979 through June 21, 1989" — fixing plaintiffs proportionate share at between 18.48% and 15.47%)
b. October 21, 1992 — $3,680.32
(for “street expenses . . . 6/22/89 — 5/31/90" fixing plaintiffs proportionate share at 17.34%)
c. October 21, 1992 — $4,805.54
(for “street repairs from May 11, 1990 through March 31,1992" — fixing plaintiffs proportionate share at 18.48%)
d. November 24, 1993 — $3,781.45
(for “street expenses, April 1, 1992 through June 30, 1993" — fixing plaintiffs proportionate share at 18%)
e.June 16, 1994 — $3,172.47
(for “street expenses July 1, 1993 through June 30, 1994”)
f.June 30, 1995 — $2,080.81
(for “street expenses July 1, 1994 through June 30, 1995”)
17. The various percentages employed by defendant Herring to calculate plaintiffs “share” of the expenses were based upon Herring’s measurement, by tape, of the exterior of all the relevant buildings in the Whittal complex; usage by plaintiff was not a factor in the calculations.
18. The October 21, 1992 invoice for $22,867.96, covering the 1979-1989 period, was prepared by Herring on the authority, he claims, of the 1989 proprietors’ meeting. The invoice was the first billing by which defendant Herring sought to recoup the costs incurred by him as a result of his supplying utility services and road services for plaintiffs benefit. Although he had, in 1970, urged plaintiff, et al, “voluntarily” to pay a portion of the costs, defendant Herring shouldered the entirety of the costs during that decade because they were “minimal.” When his expenses increased, however, he decided that the abutters to the private ways, including plaintiff, had a “moral obligation” to share in his costs. Accordingly, he unilaterally tallied the total costs he had endured for the decade, allocated 50% to the tenants of his building and 50% to the abutters, including plaintiff, and, with respect to the latter 50%, fixed proportionate responsibility by reference to his tape measurements of the square footage of the abutters’ buildings.[1]
19. The installation of speed bumps on and the periodic snow plowing and sanding of the private ways had been effected sua sponte by defendant; plaintiff neither requested nor desired those services.
20. Plaintiffs use of the utilities serving his property through defendant Herring’s property has been negligible. One employee occupies plaintiffs building; one toilet and two sinks are operational; no air conditioning is present in the building; a sprinkler system installed by plaintiff has not used any water and has, in addition, rendered defendant’s security services redundant. Plaintiff pays for telephone and electrical services to his building. The function of the building is to warehouse plaintiffs product (yam used in carpeting), and the business activity consists of a tractor-trailer’s delivering and removing product on one occasion each week.
*164 21. Plaintiff does not use Appian Way and his use of Brussels Street is limited to the weekly coming and going of.the tractor-trailer and for the passage of plaintiffs warehouseman.
22. Plaintiff has, on occasion, asked defendant to perform minor maintenance on Brussels Street. Defendant has complied. Brussels Street was not repaved during plaintiffs ownership of his property.
23. Defendant plows the snow from Brussels Street, but not at plaintiffs request. Plaintiff plows the snow away from the dock area of his own property. Approximately two-thirds of defendant’s plowing activity is for the exclusive benefit of tenants of defendant’s property.
24. Plaintiff uses domestic water that enters his building through mains leading from defendant’s property. Defendant is billed by the City of Worcester for that water.
25. Plaintiff uses sewer water that leaves his building through pipes passing through defendant’s property. Defendant is billed by the City of Worcester for that water.
26. Plaintiffs property has a fire suppression sprinkler system, installed at plaintiffs expense, the water for which would enter plaintiffs property from pipes running through defendant’s properly. Defendant is billed by the City of Worcester for that water.
27. Plaintiff was unaware that defendant had installed a central monitoring system, which warned of a fire by measuring an increase in the water used by the sprinkler system, until plaintiff received the 1979-1989 invoice from defendant.
DISCUSSION
I. THE DEEDS
Defendant contends that the deeds provide a sound foundation for his demand that plaintiff pay the actual costs, heretofore borne by defendant, of the utility services passing through defendant’s properly for the benefit of plaintiff and of the removal of snow from private ways used by plaintiff. This court finds that foundation to be of insufficient substance to support the conclusions urged by defendant.
The deeds obligate plaintiff “to maintain at its own expense all of said utility lines, sewers and mains which are within [plaintiffs] . . . premises and serve any part of the [defendant’s] . . . land.” Reciprocal covenants in the deeds require defendant to “maintain” the utility conveyances which lie within defendant’s premises and serve the plaintiffs property. Thus, the deeds create obligations only to “maintain” the vessels through which the utility services pass. To draw from the language of the deeds (viz, “to maintain”) an inference that the draftsman, and the .signatories, intended that the plaintiff was to reimburse defendant for the latter’s expenditures in providing utility services to plaintiff is to engage in impermissible reconstruction of the deeds. It is a far reach for this court to convert a deed-created obligation “to maintain” conveyances into an implied obligation to pay for the services passing through those conveyances.[2]
The better view of the deeds, then, is that they neither obligate plaintiff to pay for utility services provided by defendant through the conveyances nor require defendant to supply those services through the conveyances. The deeds mean what they say — the parties are to maintain the conveyances passing through their respective premises and the obligation either to provide the services, on the one hand, or to pay for the services thus provided, on the other, is not within the contemplation of the deeds. Plaintiff, therefore, is under no deed-grounded obligation to pay for past utility services provided at defendant’s expense.[3]
II. THE PROPRIETORS’ MEETINGS
Defendant suggests that the proprietors’ meetings authorized his billing plaintiff (and others) for their proportionate share of the costs of utility services supplied by defendant and snow removal by defendant from the private ways. For a number of reasons, that suggestion is not compelling.
No persuasive evidence was adduced at trial in support of plaintiffs claim, voiced in Count II of his complaint, that the process by which the proprietors were chosen was flawed and this court will therefore accept the proposition that the proprietors’ meetings were duly constituted. The doings of those meetings do not, however, advance defendant’s contention that plaintiff was obligated, by the proprietors’ actions, to pay certain assessments for utiliiy services and snow removal.
We start with the point that G.L.c. 84, §12, under which the proprietors purported to operate, is of limited embrace. The statute empowers the proprietors to “determine . . . what repairs of the way or bridge are necessary . . .” Id. (emphasis added). There is no legislative allusion, either by expression or by reasonable implication, to such other functions as the provision of utility services or the removal of snow.[4]
Additionally, the statute authorizes the proprietors to “determine .. . the proportion of money and of labor and materials to be furnished by each proprietor and occupant for such repairs.” Id. (emphasis added). The legislative language does not suggest that the draftsmen of §12 contemplated that the proprietors would engage a determination of money due for past benefits received by the proprietors. In like manner, G.L.c. 84, §14 permits the proprietors to contract for the repair of ways or bridges, to raise amounts to fund such contracts and to assess each proprietor a proportionate share of those amounts, all of which functions are prospective. In sum, nothing in the statutory scheme evidences a legislative purpose to empower proprietors to assess costs on account of past benefits.
Finally, this record does not demonstrate that the proprietors formally accomplished any of the actions that would lead to an enforceable levy against plaintiff. While defendant did testify that he issued bills on the *165 authority of the proprietors, it is significant that the minutes of the two proprietors’ meetings reflect no discussion or vote by the proprietors with respect to a determination of “the proportion of money and of labor and materials to be furnished by each proprietor and occupant for such repairs.” G.L.c. 84, §12. Nor was there a “vote to raise such amount as they consider necessary for carrying such contracts into effect.” G.L.c. 84, §14. The condition precedent of a proprietors’ “vote” is underscored by G.L.c. 84, §13 which pegs a non-paying proprietor’s liability in contract to his “refus[al] or neglect to comply with such vote.” At bar, the meetings, according to their minutes, were limited to votes appointing the proprietors’ Clerk, Surveyor and Assessor and to votes establishing the method of notices of future meetings and the locus of future meeting. The totality of the evidence, whether testimonial or documentary, did not establish that the proprietors voted to levy the assessments reflected on the bills issued by defendant to plaintiff.[5]
Defendant can find no support in the statutes for his view that the plaintiff is obliged, by G.L.c. 84, §§12-14, to pay for past utility services and snow removal. The legislatively created device of the proprietors’ meeting and assessment is inapplicable to the instant dispute because the statutes apply only to the repair of private ways and to the allocation of prospective costs therefor. And, even assuming that G.L.c. 84, §§12-14 were controlling, the proprietors at bar have failed to comply with the procedural mandate of the statute. Defendant’s demand for payment, insofar as it rests on the authoriiy of the proprietors, rests on quicksand.
III. FUTURE COSTS
Having concluded that plaintiff is not obligated, by deed or by statute, to pay the bills issued to him by defendant for past utility services and snow removal costs incurred by defendant, the question remains whether or not plaintiff will be liable for his proportionate share of those costs in futuro. That an action at law offers no remedy to defendant is not dispositive of his search for relief. In the circumstances at bar, equity will operate to ease the burden now unfairly encumbering defendant. See Foster v. Evans, 384 Mass. 687 (1981) (where party has no adequate remedy at law, he is entitled to equitable relief).
Had there been evidence that the original grantor and grantees of the various Whittal parcels intended that the grantor and his successors should bear the burden of providing utility services and road maintenance and that such an allocation of the burden was part of the give and take of negotiations incident to the grant, then equity would have little sympathy for defendant Herring’s present plight. Similarly, had there been evidence that defendant knowingly assumed the responsibility for those costs in return for more favorable terms when he acquired his interest, then defendant would be ill-positioned now to complain that he is unfairly disadvantaged by his paying for the services enjoyed by plaintiff and other successor grantees. There is, however, no such evidence that either the original grantor or his successor, the present defendant, bargained for terms that required their obligation to finance the services now at issue. Defendant, therefore, does not enter the equity fray bowed by the weight of a “consequence of the bargain” handicap.
It might even be argued that, insofar as the deeds are silent beyond the obligation to maintain the conveyances for the services, there may be no impediment, in the deeds, to defendant’s summary refusal to supply future services (by, for example, diverting domestic water from the conveyances that carry it to plaintiffs premises and by blocking the sewage flowing from plaintiffs property to the vehicles on defendant’s property, although such a diversion and blocking might well run afoul of the deeds’ mandate that defendant “maintain” the utility conveyances; defendant might also choose not to remove snow from that portion of the private way upon which plaintiff relies for access to his premise). That defendant has not elected to avail himself of such a pre-emptive strike is encouraging in that it manifests a willingness to avoid escalation of the dispute and to cooperate in its reasonable resolution. Equity will look kindly upon such a manifestation of bona fides. See B.P.G. Autoland Jeep-Eagle, Inc. V. Chrysler Credit Corp., 799 F.Supp. 1250 (D.Mass. 1992) (equitable powers of district court can only be justly invoked by deserving parties).
There is no question but that the continuation of the status quo will result in an unjust enrichment of plaintiff. He will enjoy the benefits, albeit proportionately minimal, of domestic water, sewage disposal and snow removal at no cost to himself. Defendant, by contrast, will be tasked with the obligation of funding services that provide him with little or no benefit. The deeds and the proprietors device have provided him no relief at law. He is, laudably, reluctant to engage in self-help activities that might intensify the dispute and further polarize the disputants. In these circumstances equity can and should provide relief from future unjust enrichment of plaintiff and unjust detriment to defendant. See Branch v. F.D.I.C., 825 F.Supp. 384 (D.Mass. 1993) (under Massachusetts law there is jurisdiction in equity to prevent, by means of a constructive trust, unjust enrichment arising from breach of fidiciary relation). See also Nolan, Equitable Remedies, 31 Mass. Prac. §351, n. 32.
In order, therefore, to resolve this dispute in an equitable fashion, the court will declare that a trust is hereby imposed upon plaintiff, the object of which will be to insure that plaintiff will not be unjustly enriched by his future receipt of utility and snow removal services provided by defendant. The trust will require both that plaintiff pay his proportionate share, calculated by use, of the utility services supplied by defendant from the date of this judgment and that plaintiff pay his proportionate share, to be determined by fair *166 negotiation between the parties, of the cost of snow removal by defendant from the private way(s) used by plaintiff after the date of this judgment.
CONCLUSION
Judgment is to issue declaring that:
1. The deeds oblige defendant Herring to maintain the utility conveyances on his property that serve plaintiffs premises;
2. The deeds permit plaintiff to use those utility conveyances;
3. The deeds do not require defendant Herring to provide either utility services or snow removal services to plaintiff;
4. The deeds do not permit defendant Herring to require plaintiff to reimburse defendant Herring for his cost of providing utility and snow removal services to plaintiff before the date of this judgment;
5. The proprietors’ meetings do not authorize the defendant Herring to require plaintiff to reimburse defendant Herring for his cost of providing utility and snow removal services to plaintiff before the date of this judgment;
6. Equity will impose a trust upon plaintiff, the object of which is to avoid future unjust enrichment of plaintiff as a result of services provided by defendant Herring; said trust shall require plaintiff to pay his proportionate share, calculated by usage, of defendant Herring’s cost of providing utility services to plaintiff and shall require plaintiff to pay his proportionate share, to be determined by fair negotiations between the parties, of defendant Herring’s cost of snow removal from the private way(s) used by plaintiff.
7. The obligations created by said trust shall be effective from the date of this judgment.
ORDER
Judgment shall enter forthwith in accordance with the declarations recited in the CONCLUSION, supra.

 At trial, defendant Herring conceded that some, if not most, of his measurements were approximations.

 The conclusion that “to maintain” ought not to be construed so as to include an obligation to pay for services is strengthened by language in the deeds that creates an obligation to reimburse one who enters onto another’s premises for the purpose of maintaining a conveyance located thereon and by deed provisions that obligate plaintiff (and others) to pay for steam supplied by defendant. The draftsman and signatories expressly imposed upon plaintiff (and his predecessors and successors) the duty to pay in those defined circumstances. The omission so to impose with respect to the cost of utility services must be taken to have been more than an inadvertency.

 What has been observed, supra, concerning the deeds’ silence as to the defendant’s obligation to provide utility services and the plaintiffs obligation to pay therefor has equal application to the claimed obligations with respect to snow removal. The deeds create neither an obligation to plow nor an obligation to pay if plowing occurred.

 Not without significance is the fact that both notices of the meetings of the proprietors recited that their purpose was to address the “maintenance and repair” of Brussels Street and Appian Way.

 The absence of a formal vote also creates serious concerns with respect to the method of assessment (to wit, defendant’s approximation of square footage and his employment of a linear standard rather than a usage measurement), the method of billing (to wit, defendant’s invoices to plaintiff were not identified as having been issued on behalf of the proprietors) and the method of satisfaction (to wit, defendant’s invoices sought repayment to him individually, although the bills were purportedly issued on behalf of the proprietors).